SAMUEL Z. KORFF AND SARAH KORFF, PARTNERS T/A S. KORFF & SON, M. B. ALTMAN SONS, OSCAR HEYMAN & BROTHERS, AND HARRY GORDON & SON, PLAINTIFFS-RESPONDENTS, v. G AND G CORPORATION, AND MAUDE DAOUD, INDIVIDUALLY AND TRADING AS DAOUD BROTHERS, DEFENDANTS-RESPONDENTS.

Argued April 30, 1956—Decided May 28, 1956.

·Mr. *Carl Kisselman* argued the cause for co-plaintiffs-appellants Charles Penneys and Samuel Penneys.

*Mr. Harry Miller* argued the cause for defendant-respondent Robert C. Koury, guardian *ad litem* of George J. Daoud, II.

The opinion of the court was delivered by

JACOBS, J. On November 22, 1954 Samuel Z. Korff and others filed their complaint in the Chancery Division seeking the appointment of a receiver for the G and G Corporation and other relief. The complaint alleged that the plaintiffs were creditors of the defendant corporation which had been organized under the laws of New Jersey and had its principal place of business at 1523 Boardwalk, Atlantic City. It alleged further that the corporation had been organized for the sole purpose of assisting Maude Daoud, individually and trading as Daoud Brothers, in carrying out her retail jewelry business at the aforementioned address and that its original capital consisted of cash and jewelry contributed by Charles Penneys, Samuel Penneys and Maude Daoud. It asserted that the corporation's board of directors consisted of Charles Penneys, Samuel Penneys, Maude Daoud and George Skaf (designated as an agent of Maude Daoud) and charged that the corporation's capital assets had "been diverted for the individual benefit of its directors and stockholders," that the corporation was unable to meet its obligations as they matured, and that a receiver was necessary to conserve the corporate assets and "discover the relationship and the financial transactions between the defendant Maude Daoud, individually and trading as Daoud Brothers, and the officers and directors of the defendant G and G Corporation." In their prayers for relief the plaintiffs demanded that the corporation be declared insolvent and a receiver appointed under the court's statutory and general equity powers; that the assets of the corporation and "the rights of the plaintiffs and all creditors and stockholders of said corporation may be ascertained"; that an accounting be made of "the assets held and the debt due by the defendant, Maude Daoud, individually and trading as Daoud Brothers, to G and G Corporation"; and that an order be entered compelling Maude

Daoud to turn over to the receiver all of the assets in her possession which are found to be the property of the corporation.

On December 3, 1954 Judge Haneman appointed a receiver and on December 9, 1954 he admitted Charles Penneys and Samuel Penneys as parties plaintiff in accordance with their verified petition seeking such relief. On December 23, 1954 an order was entered confirming and continuing the appointment of the receiver. Thereafter claims were filed with the receiver by Charles Penneys and Merion Textiles, a partnership composed of Charles Penneys, Samuel Penneys and Harry Penneys, all residents of Pennsylvania. In turn, the receiver asserted claims against Charles Penneys and Merion Textiles, and after negotiation a compromise offer of settlement was submitted to and approved by the court in an order dated July 13, 1955. During a hearing before the court on October 25, 1955 it was disclosed that Maude Daoud had been examined by counsel for the receiver with respect to a check made by the Philadelphia Life Insurance Company in the amount of $91,622.57, made payable to "Maude Daoud, temporary guardian of George J. Daoud, II, minor," endorsed in that fashion, and bearing a rubber stamp endorsement "pay to the order of Girard Trust Corn Exchange Bank, Pennswood Fabrication Muriel Textiles." Her explanation was as follows:

"Mr. Penneys called me up the early part of February and said, 'Maude, I can't discount the notes that you have sent me for the G & G Corporation and I have to have money to pay the accounts and notes of the G & G Corporation and I would suggest you trying to get the money from the Philadelphia Life Insurance Company that you have there for your son and send it to me for the G & G Corporation so I can pay the bills with the money. Otherwise, I will not be able to meet any of the G & G bills.'

So after calling me several times and telling me that it was a must, he got in touch with the Philadelphia Life Insurance Company with a Mr. Phil Steel and they sent me down copies of a letter for me to send to the Philadelphia Life Insurance Company and take my child's money out and give it to the G & G Corporation. Then the check was sent to me to Florida and I endorsed it and immediately sent it to Mr. Charles Penneys to his Philadelphia office."

After learning of the foregoing testimony the court entered an order dated November 21, 1955 which set forth that it appeared that George J. Daoud II, an infant under the age of 14 years, had an interest in the proceedings and that a guardian *ad litem* should be appointed for him, and designated Robert C. Koury as such guardian. On December 15, 1955 Mr. Koury filed a notice of motion that he would apply for leave to file a claim against the receiver, a cross-claim against Maude Daoud, and a counterclaim against Charles Penneys and Samuel Penneys, and for leave to join the partnership Merion Textiles and file a cross-claim against it. Attached to the notice of motion was Mr. Koury's affidavit which set forth that his partial investigation had led him to the belief that the "sum of $91,622.57 was unlawfully appropriated, converted by the said Maude Daoud in conjunction with others and diverted by them to their own personal uses and benefits in violation of the legal and equitable rights of the infant, George J. Daoud II, and that by reason thereof there exists a cause of action against Maude Daoud, G & G Corporation, Charles H. Penneys, Samuel Penneys, Merion Textiles and others, in favor of the said infant, George J. Daoud II, for the recovery by him against each or all of the aforesaid persons of the sum of $91,622.57." On January 3, 1956 the court granted Mr. Koury's motion and gave him leave to file an answering pleading to the complaint, proof of claim with the receiver and a cross-claim against him, a cross-claim against Maude Daoud, a counterclaim against Charles Penneys and Samuel Penneys, and a cross-claim against Merion Textiles and its members who were added as parties. On January 10, 1956 Charles Penneys and Samuel Penneys filed notice of appeal to the Appellate Division from that part of the court's order which allowed Mr. Koury to file a counterclaim against Charles Penneys and Samuel Penneys, and a cross-claim against Merion Textiles and its members who were added as parties, and permitted service of the counterclaim and cross-claim in accordance with the rules of practice. While their appeal

was pending in the Appellate Division we certified it under *R. R.* 1:10–1; no other notices of appeal were ever filed by any of the parties to the proceedings.

The co-plaintiffs-appellants Charles Penneys and Samuel Penneys contend that in the light of their nonresidence the Chancery Division "was without jurisdiction to enter the order appealed from." They do not, at this juncture, present anything whatever in opposition to the merits of the claim being asserted on behalf of George J. Daoud, II. Their position is that although the claim may be presented in Pennsylvania where they can be served, it may not be effectively prosecuted in New Jersey where they are not amenable to personal service. They deny that their voluntary action in becoming co-plaintiffs in the receivership proceeding was legally sufficient to vest jurisdiction in the Superior Court for the entry of the order of January 10th. And they seek supporting comfort in some of the recent New Jersey decisions which dealt generally with the privileges and immunities of nonresident participants in court proceedings and the scope of jurisdiction which may rightly be exercised over them. See *Whalen v. Young,* 15 *N. J.* 321 (1954); *Mueller v. Eucenham,* 33 *N. J. Super.* 156 (*App. Div.* 1954); *Swanson v. Swanson,* 10 *N. J. Super.* 513 (*App. Div.* 1950), affirmed 8 *N. J.* 169 (1951); *Schuster v. Schuster,* 9 *N. J. Super.* 11 (*App. Div.* 1950); *Republic of China v. Pong-Tsu-Mow,* 33 *N. J. Super.* 24 (*Law Div.* 1954). See also *Munday v. Vail,* 34 *N. J. L.* 418, 422 (*Sup. Ct.* 1871). *Cf. Englander v. Jacoby,* 132 *N. J. Eq.* 336 (*Ch.* 1942); *Four Star Delivery Service, Inc. v. Central Winery, Inc.,* 133 *N. J. Eq.* 330 (*Ch.* 1943); *Ertag v. Haines,* 30 *N. J. Super.* 225 (*Law Div.* 1954).

In the early decision of *Halsey v. Stewart,* 4 *N. J. L.* 366, 426 [*Reprint*] (*Sup. Ct.* 1817), the court held that nonresidents were immune from civil process while "necessarily going to, staying at, or returning" from New Jersey court proceedings. This ruling followed earlier English precedents and has been adhered to in many later decisions in our courts. See *Herman v. Arndt,* 116 *N. J. L.* 150 (*E. & A.*

1936); *Riewold v. Riewold,* 121 *N. J. Eq.* 134 (*Ch.* 1936);
*Younger v. Younger,* 5 *N. J. Super.* 371 (*App. Div.* 1949);
*Randall v. Randall,* 14 *N. J. Super.* 110 (*Ch. Div.* 1951).
*Cf. Baskerville v. Kofsky,* 18 *N. J. Misc.* 325 (*C. P.* 1940).
Although various reasons for the broad doctrine embraced
in the cases have been advanced from time to time they
have for the most part been discredited in recent legal
writings. See *Keefe and Roscia, "Immunity and Senti-
mentality,"* 32 *Cornell L. Q.* 471 (1947); *Note, "Immunity
of Non-Resident Participants in A Judicial Proceeding from
Service of Process—A Proposal for Renovation,"* 26 *Ind.
L. J.* 459 (1951); *Clapp, "Civil Procedure in State Courts,"*
1951 *Annual Survey of American Law* 799, 803 (1952).
Professor Keefe acknowledges that the immunity serves the
public interest when applied to nonresident witnesses who
might well, in its absence, decline to enter the State and aid
the just disposition of the pending proceeding; but he voices
the opinion that its application makes little sense when
applied in favor of nonresident parties, particularly nonresi-
dent plaintiffs who have freely availed themselves of the local
courts; and he pointedly inquires as to whether courts should
not justly subject nonresident plaintiffs to civil process in
separate proceedings by local residents rather than to remand
such residents to proceedings in far away jurisdictions. In
*Baldwin v. Emerson,* 16 *R. I.* 304, 15 *A.* 83 (1888), the
Rhode Island Supreme Court forcefully rejected the pre-
vailing view (as have several other courts) and declined to
afford immunity from process to a nonresident who was
in Rhode Island in connection with a suit in which he was
a plaintiff; in the course of his opinion Justice Matteson
said: ·

"The reasons assigned for the exemption of non-resident suitors
from the service of a summons are that courts of justice ought to
be open and acccessible to suitors; that they ought to be permitted
to approach and attend the courts in the prosecution of their claims
and the making of their defenses without the fear of molestation
or hinderance; that their attention ought not to be distracted from
the prosecution or defense of the pending suit; that they might be
deterred from prosecuting their just rights or making their just

defenses to a suit by reason of their liability to suit in a foreign jurisdiction. While we concede the force of the reasons advanced for protecting non-resident witnesses from the service of a summons against them for the commencement of a suit, *eundo, morando, et redeundo*, we are not convinced of the sufficiency of the reasons assigned for the exemption of non-resident suitors from such process. We think it would rarely happen that the attention of a non-resident plaintiff or defendant would be so distracted by the mere service of a summons from the immediate business in hand in prosecuting or defending a pending suit that the interests of justice would suffer in consequence, or that the liability to such service would often deter them from prosecuting or defending their just claims or rights. The reasons assigned for the exemption would apply equally as well to resident as to non-resident suitors, and it has never been deemed necessary to exempt resident suitors from the service of a summons, so far as we have been able to find, except in the single state of Pennsylvania. We think these reasons are fanciful, rather than substantial. We are of the opinion, therefore, that a non-resident suitor attending court in the prosecution of a suit is not exempt from the service of a summons against him in another suit."

But see *Stewart v. Ramsay,* 242 *U. S.* 128, 37 *S. Ct.* 44, 61 *L. Ed.* 192 (1916). *Cf. Lamb v. Schmitt,* 285 *U. S.* 222, 52 *S. Ct.* 317, 319, 76 *L. Ed.* 720 (1932), where the United States Supreme Court referred to the immunity doctrine as one grounded on the convenience of the court rather than the parties; it noted that it proceeds upon the basis that "the due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation"; it suggested that the immunity should not be enlarged beyond the reason upon which it was founded and should "be extended or withheld only as judicial necessities require"; and it declined on the facts before it to permit invocation of the immunity to foreclose the service of process in a new proceeding which was sufficiently related to the litigation then being attended by the nonresident. In *Swanson v. Swanson, supra,* 8 *N. J.,* at *page* 178, Justice Oliphant recently indicated that the judicial approach in the *Lamb*

case coincided generally with that of the New Jersey courts. See *Keefe and Roscia, supra,* 32 *Cornell L. Q.,* at 482.

In *Englander v. Jacoby, supra,* a nonresident obtained law judgments in the Essex County Circuit Court against two defendants who were in the position of principal and surety. The surety later brought a proceeding in the Court of Chancery for exoneration and sought a restraint against execution on the law judgment against him until the remedies against the principal were exhausted. The nonresident was served by publication and moved to set aside the service. In denying the motion Vice-Chancellor Bigelow held that although the action was *in personam* the substituted service was proper; he noted that substituted service could be effected in all instances where due process did not require actual service within the State; he expressed the view that a party who appears in a New Jersey court "submits himself to its jurisdiction in respect to those outreaches of the case which are reasonably to be anticipated"; and he held that the Chancery proceeding, though it took the form of an independent action, could properly be considered as ancillary to or an outreach of the original law action which the nonresident had instituted in the Circuit Court. In *Four Star Delivery Service Inc. v. Central Winery, Inc., supra,* the court approved fully the doctrines announced in the *Englander* case and applied them to sustain substituted service in a reformation suit in the Court of Chancery again a foreign corporation which had earlier instituted a law action in the Hudson County Circuit Court.

Unlike the *Englander* and *Four Star* cases and the cited immunity cases, we are not here burdened with the historically troublesome problems incident to independent actions and their jurisdictional requirements; the question now before us is whether the counterclaim against Charles Penneys and Samuel Penneys in the very same action which they voluntarily joined as co-plaintiffs was properly permitted to be filed and served in accordance with the principles applicable to counterclaims generally. It is to be borne in mind that our modern rules of practice, modeled largely

after the liberal federal rules, contain sweeping provisions for the filing and service of counterclaims and cross-claims and the addition and intervention of parties. See *R. R.* 4:13; *R. R.* 4:14; *R. R.* 4:37. *Cf. R. R.* 4:5. And it is equally to be borne in mind that by this time it must be well known that our courts are firmly committed to the enlightened policy which points generally to the joinder of all matters in controversy between all of the parties in a single proceeding for just and expeditious disposition at one time and place. See *N. J. Highway Authority v. Renner,* 18 *N. J.* 485, 492 (1955); *Asbestos Fibres, Inc. v. Martin Laboratories, Inc.,* 12 *N. J.* 233, 239 (1953); *Massari v. Einsiedler,* 6 *N. J.* 303, 313 (1951). *Cf. Vacca v. Stika,* 21 *N. J.* 471 (1956); *Garrou v. Teaneck Tryon Co.,* 11 *N. J.* 294, 305 (1953); *Tumarkin v. Friedman,* 17 *N. J. Super.* 20, 24 (*App. Div.* 1951), certification denied 9 *N. J.* 287 (1952). See also *Schnitzer, "Civil Practice and Procedure,"* 9 *Rutgers L. Rev.* 307, 328 (1954).

When the co-plaintiffs joined the receivership proceeding they knew or should reasonably have anticipated that the defendant corporation might file a counterclaim against them. In *Galler v. Slurzberg,* 22 *N. J. Super.* 477, 483 (*App. Div.* 1952), certification denied 11 *N. J.* 582 (1953), the court rightly determined that a defendant might file a counterclaim even though it was entirely unrelated to the original complaint. And in *Adam v. Saenger,* 303 *U. S.* 59, 58 *S. Ct.* 454, 458, 82 *L. Ed.* 649 (1938), the United States Supreme Court upheld California's practice which permits defendants to file counterclaims and cross-claims though unrelated to the complaints and allows them to be served on the attorneys of nonresident plaintiffs; in the course of his opinion for the Court, Justice Stone said:

"There is nothing in the Fourteenth Amendment to prevent a state from adopting a procedure by which a judgment *in personam* may be rendered in a cross-action against a plaintiff in its courts, upon service of process or of appropriate pleading upon his attorney of record. The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him

as being there for all purposes for which justice to the defendant requires his presence. It is the price which the state may exact as the condition of opening its courts to the plaintiff. *Frank L. Young Co. v. McNeal-Edwards Co.*, 283 *U. S.* 398, 400, 51 *S. Ct.* 538, 539, 75 *L. Ed.* 1140, 1141, compare *Chicago & N. W. R. Co. v. Lindell*, 281 *U. S.* 14, 17, 50 *S. Ct.* 200, 201, 74 *L. Ed.* 670 [672]."

Furthermore, when the plaintiffs joined the receivership proceeding they knew or should reasonably have anticipated that additional parties might properly be permitted to intervene or be added as defendants (*R. R.* 4:13; *R. R.* 4:14; *R. R.* 4:37; *Ciocca v. Hacker, 4 N. J. Super.* 28, 32 (*App. Div.* 1949)) and that once they became parties they might file cross-claims and counterclaims. In 4 *Moore's Federal Practice* (*2d ed.* 1950), 127, the author expresses the view that if general intervention is allowed "it is reasonably clear that the intervenor has the same right to counterclaim or cross-claim as an original party," and in 3 *Moore, supra,* 15, he states that a third-party defendant may counterclaim and cross-claim and that "an additional party, brought in under *Rule* 13(*h*) [*Fed. Rules Civ. Proc.* 28 *U. S. C. A.*], should also be within and subject to the terms of *Rule* 13 relative to counterclaims and cross-claims." But *cf. Mueller v. Eucenham, supra,* 33 *N. J. Super.,* at *page* 164. See *Schnitzer and Wildstein, New Jersey Rules Service,* A IV 325–327. However, we need not concern ourselves with the broader question as to whether an intervening and added defendant should generally be confined (for reasons underlying the discretionary doctrine of *forum non conveniens* or otherwise—see 26 *Ind. L. J., supra,* at 462) to the filing of a counterclaim or cross-claim which is substantially interrelated to the cause presented in the nonresident's original complaint; in the instant matter it is clear that such interrelationship did exist and that the interests of justice were significantly advanced by permitting the filing and service of the counterclaim in the receivership proceeding pending in the Chancery Division.

The original complaint alleged insolvency and diversion of the corporate assets for the benefit of the directors and

stockholders and prayed for the appointment of a receiver and other relief; it specifically sought discovery of the relationship and the financial transactions between Maude Daoud and the other corporate officers and directors and the ascertainment of the rights of the corporate creditors and stockholders. When the co-plaintiffs who were directors and stockholders joined the proceedings they denied any wrongdoing but they were fully aware that for the protection of the corporate creditors and stockholders the Chancery Division would have the right to investigate thoroughly the affairs of the corporation and its officers and directors. *Cf.* *R. S.* 14:14–30. In the course of the receivership proceedings the charge was made that a check representing trust funds of the infant George J. Daoud II was improperly turned over by one of the corporate directors (Maude Daoud) to another of the corporate directors (the co-plaintiff Charles Penneys) upon his representation that it would be used to pay corporate obligations; whether any portion of the trust funds was actually used for such purpose is at this point unclear, but the check allegedly delivered to Charles Penneys apparently bears an endorsement of (Muriel) Merion Textiles, the partnership of which the co-plaintiffs are members. We need not at this stage of the proceedings pass upon the precise nature of the legal or equitable claims which may be available on the infant's behalf. His guardian *ad litem* urges that he has not only a direct action but also a derivative action through the corporation (or its receiver) against the alleged co-plaintiff wrongdoers; he also urges that he has a direct claim against the corporation (or its receiver) which may in turn have a claim against the alleged co-plaintiff wrongdoers. We mention his claims at this point to indicate how closely related they are to the comprehensive receivership proceeding and how manifestly just and appropriate it is that they be passed upon in the single action now pending in the Chancery Division. Whether the counterclaim be viewed strictly as an outreach or incident of the receivership proceeding, or broadly as a counterclaim by a proper intervening or added defendant on a matter sub-

stantially related to the cause presented in the original complaint, we are entirely satisfied that the Chancery Division correctly allowed its filing and service in accordance with the rules of practice.

The New Jersey cases cited by the appellants in opposition to the foregoing are readily distinguishable; for the most part they dealt, not with plaintiffs who voluntarily availed themselves of our judicial facilities and were then faced with counterclaims or cross-claims, but with unwilling suitors who were in our courts as defendants under compulsory process. Thus in *Whalen v. Young, supra*, the plaintiff's amended complaint was against three nonresidents who were served under the nonresident motorists act. One of the defendants sought to cross-claim against another defendant and to effect service in accordance with *R. R.* 4:5–2; a majority of the court held that this was impermissible. *Cf. Schnitzer, supra*, 9 *Rutgers L. Rev.*, at 327. In *Schuster v. Schuster, supra*, the Appellate Division narrowly determined that a divorce proceeding could not be amended by the addition of a count for separate maintenance where the defendant was then a nonresident and service was sought to be made on his attorney. *Cf. Mueller v. Eucenham, supra*, 33 *N. J. Super.*, at *page* 163. In *Republic of China v. Pong-Tsu-Mow, supra*, the Law Division held that an attachment action, against a nonresident defendant who entered an appearance after his motion to quash was overruled, could not be amended by the filing of a supplemental complaint setting forth a much larger claim; in the course of his opinion in the Law Division Judge Gaulkin expressed the view that due process prohibits the addition of a wholly distinct claim against a nonresident defendant "unless he himself counterclaimed or invoked the affirmative assistance of the court." See *In the Matter of Indiana Transportation Co.*, 244 *U. S.* 456, 37 *S. Ct.* 717, 61 *L. Ed.* 1253 (1917); *Freeman v. Bee Machine Co.*, 319 *U. S.* 448, 63 *S. Ct.* 1146, 87 *L. Ed.* 1509 (1943).

In *Swanson v. Swanson, supra*, the plaintiff instituted a divorce action asserting that she was a resident of New

Jersey. When her assertion was shown to be false the trial court signed an order to show cause why she should not be held in contempt and it was served upon her in New York. This court, in holding that such service was improper, pointed out that the order to show cause "set forth a charge that is criminal in nature and an offense against the State, and as such in order to obtain effective jurisdiction of the person of the defendant the process had to be served upon her within the confines of this State." See 8 *N. J.*, at *page* 180; *Mueller v. Eucenham, supra*. No comparable situation is presented in the case before us. However, *Mueller v. Eucenham, supra,* did relate to a counterclaim by an intervening or added defendant and calls for further comment. There the plaintiff's and the defendant's cars collided and the plaintiff instituted an action for property damage in a New Jersey court. The plaintiff was then a resident but later moved out of the State. The defendant filed a counterclaim seeking property and personal injury damages and the Appellate Division sustained his right to do so. See *Galler v. Slurzberg, supra; Adam v. Saenger, supra.* The defendant also filed, with leave of court, a counterclaim as guardian *ad litem* for his children who had been in his car and were injured in the collision; the Appellate Division held that this counterclaim could not be filed and served on the nonresident plaintiff's attorney because, in its opinion, the claims of the children were not " 'outreaches of the case' which were 'reasonably to be anticipated' by the non-resident plaintiff." But see *L.* 1954, *c.* 61; *R. S.* 39:7–2.1. We incline to question the restrictive approach underlying this determination although we need not pass on the court's actual holding since the circumstances in the *Mueller* case bear no resemblance to the facts in the instant matter.

When residents of New Jersey are involved in local transactions and institute actions as plaintiffs in our courts, they know or should know that our courts will exert proper efforts towards obtaining the joinder of the various claims arising from all facets of the transactions to the highly just end that costly and dilatory piecemeal litigation and multiple

actions may be avoided. Nonresidents, who necessarily institute their New Jersey proceedings through New Jersey attorneys, should be chargeable with the same knowledge as residents and should be subjected to the same consequences. And although our courts should be as open and accessible to nonresident plaintiffs as they are to resident plaintiffs, there is no just reason why the nonresident plaintiffs should have any preferred or superior status. *Cf. Gore v. United States Steel Corp.,* 15 *N. J.* 301, 311 (1954), *certiorari* denied 348 *U. S.* 861, 75 *S. Ct.* 84, 99 *L. Ed.* 678 (1954); *Keefe and Roscia, supra,* 32 *Cornell L. Q.,* at 474. Traditional notions of fair .play and substantial justice may very well preclude New Jersey from exercising jurisdiction through substituted service over nonresidents who have had insufficient contact with it; but nonresident plaintiffs who voluntarily avail themselves of the advantages of New Jersey's judicial facilities are hardly in any position to deny the sufficiency of their contact for purposes of related counterclaims and cross-claims in the very proceedings instituted by them. See *International Shoe Co. v. Washington,* 326 *U. S.* 310, 66 *S. Ct.* 154, 90 *L. Ed.* 95 (1945); *Ehrenzweig, "The Transient Rule of Personal Jurisdiction: The 'Power' Myth and Forum Conveniens,"* 65 *Yale L. J.* 289, 311 (1956). *Cf. Adam v. Saenger, supra; Freeman v. Bee Machine Co., supra.*

The final item requiring mention is the propriety of the Chancery Division's order allowing the filing and service of the cross-claim against the partnership Merion Textiles and its members. The only appeal from the order was taken individually by Charles Penneys and Samuel Penneys who were co-plaintiffs in the receivership action and the statement under *R. R.* 1:7–1(c) of the questions involved was confined to them; no appeal was ever taken by or on behalf of the partnership and its members and they have no standing to attack the order in this Court at this time. Furthermore, they voluntarily filed a claim with the receiver, and in the light of the intertwined circumstances and the principles embraced earlier in this opinion, this

action may in itself be deemed to have furnished a fair and sufficient jurisdictional basis for the Chancery Division's order permitting the filing and service of the cross-claim. See *Alexander v. Hillman,* 296 *U. S.* 222, 56 *S. Ct.* 204, 80 *L. Ed.* 192 (1935); *In re Solar Manufacturing Corporation,* 200 *F. 2d* 327 (3 *Cir.* 1952), *certiorari* denied *Marine Midland Trust Co. v. McGirl,* 345 *U. S.* 940, 73 *S. Ct.* 831, 97 *L. Ed.* 1366 (1953). *Cf. X-L Liquors v. Taylor,* 17 *N. J.* 444, 454 (1955); *Darby v. Philadelphia Transp. Co.,* 73 *F. Supp.* 522, 524 (*D. C. Pa.* 1947).

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, JACOBS and BRENNAN—5.

*For reversal*—Justice HEHER—1.